**AMERICAN HISTORICAL ASSOCIATION, et al., Plaintiffs,**

**v.**

**NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, et al., Defendants.**

**No. CIV.A. 01–2447(CKK).**

United States District Court, District of Columbia.

March 28, 2004.

Scott Lawrence Nelson, Public Citizen Litigation Group, Washington, DC, for Plaintiffs.

Craig M. Blackwell, U.S. Department of Justice, Washington, DC, for Defendants.

Adam P. Strochak, Weil, Gotshal & Manges, L.L.P., Washington, DC, for Movant.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

### I. Introduction

The Court is presented with a dispute over the relationship between an executive order issued by the President of the United States and a statute passed by Congress. In particular, the Court is asked to determine whether the President has overstepped the limitations on his power by issuing an executive order that alters the terms of a statute. Plaintiffs, research organizations, individual researchers, and a public interest organization, all seek access to former President Ronald Reagan's presidential records, which they claim are being improperly withheld by the executive branch. At issue is Executive Order No. 13,233, signed by President George W. Bush on November 1, 2001, which purports to "further implement" the Presidential Records Act of 1978, 44 U.S.C. §§ 2201–2207 (1991). Plaintiffs would have this Court find Executive Order No. 13,233 an impermissible exercise of the executive power, necessarily enjoining its implementation. Plaintiffs originally requested injunctive relief requiring Defendants National Archives and Records Administration and the Archivist to produce records that had not been released to the public under the terms of Executive Order. However, at this stage in the litigation, the only documents that remain unavailable are 74 pages over which constitutional privilege has been asserted.

Pending before the Court are Defendants' motion to dismiss all counts of Plaintiffs' complaint, and Plaintiffs' motion for summary judgment on one count of their complaint. In addition to the briefing filed by the parties to this matter, the Court granted the Association of American Publishers, and several other interested groups, leave to collectively file an amicus brief. These documents, as well as several notices and responses that the parties filed during the ongoing privilege review, have been considered by the Court.

After an examination of the parties' motions, the briefs, and the relevant law, the Court determines that Plaintiffs' suit is not justiciable at this juncture. Plaintiffs have not shown that they have standing to bring this suit, and the Court also finds that their claim is not ripe.

## II. Factual and Statutory Background

### A. Historical Context

Prior to 1974, the wide array of materials generated during a presidency were generally considered the property of that President when his term ended, although those ownership rights might be limited somewhat by the public interest in them as records of government activity. *See Nixon v. Administrator of General Services,* 433 U.S. 425, 431, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *Nixon v. United States,* 978 F.2d 1269, 1270 (D.C.Cir.1992). In the midst of the Watergate investigation, however, Congress passed the Presidential Recordings and Materials Act ("PRMA"), which transferred control of President Richard Nixon's presidential records to the Administrator of General Services (later changed to the "Archivist"), and directed the Administrator to develop regulations providing for public access to the materials. *See* 44 U.S.C. § 2111 note. The PRMA was upheld as constitutional in *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). Although the Court in *Nixon v. Administrator of General Services* held that there is a legal foundation for a former president's claim to executive privilege surviving his tenure in office, the Court also held that the former president's interest in keeping the records private erodes over time. *Id.* at 449, 451, 97 S.Ct. 2777.

### B. Presidential Records Act

Several years later, Congress passed the Presidential Records Act of 1978 ("PRA"), which addressed this issue of public access to presidential papers in a broader context. In keeping with the view that presidential records are not personal property, the Act states that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with this chapter." 44 U.S.C. 2202. The Act confers on the Archivist of the United States "responsibility for the custody, control, and preservation of, and access to, the Presidential records" generated during the outgoing President's term or terms. 44 U.S.C. 2203(f)(1). It further directs that the "Archivist shall have an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions of this Act." *Id.* In conjunction with this mandate, the PRA makes several provisions for the restriction of access to Presidential records.[1]

---

1. In August 2001, in anticipation of the expiration of the restrictions on former President Reagan's records, the Archivist publicly addressed the procedures governing the opening of presidential records under the PRA:

   The PRA also establishes a process for access to the records of Presidents from Ronald Reagan onwards. It allows public access to the records beginning five years after the President leaves office, but permits the former President and the Vice President to invoke up to six specific restrictions to public access for up to twelve years.

   For the first five years after the President leaves office, his records are generally exempt from public access of any kind, including the Freedom of Information Act (FOIA). During this period, only Congress, the courts, and the incumbent and former Presidents may have access.

   For the next seven years, anyone can request access to Presidential records through the Freedom of Information Act (FOIA), but various exemptions under the PRA and FOIA still apply. The PRA exemptions include national security information that is properly classified; information about appointees to Federal office; information specifically exempt from disclosure by law; trade secrets and confidential business information; confidential communications requesting or submitting advice between the President and his advisors or between such advisors; and information which, if disclosed, would cause a clearly

First, prior to leaving office, a president can restrict access to certain categories of information for up to 12 years. *Id.* § 2204(a)(1)-(6).[2] In relevant part, the Act allows a president to restrict access to "confidential communications requesting or submitting advice, between the President and his advisers, or between such advisors" for 12 years. *Id.* § 2204(a)(5).

Records not restricted for the 12–year period, shall be made available by the Archivist to the public after five years, generally subject to the conditions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.[3] 44 U.S.C. §§ 2204(b)(2)(A), 2204(c)(1). Each of these FOIA exemptions may apply to presidential records indefinitely.[4]

The one exception to this direction is that presidential records cannot be withheld from members of the public based on FOIA exemption (b)(5). 44 U.S.C. § 2204(c)(1). In the ordinary FOIA context, the public is not entitled to materials that fall under exemption (b)(5), "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In the context of presidential records, however, the (b)(5) exemption is inapplicable, so such materials are considered records belonging to the National Archives, and must be "granted on nondiscriminatory terms" to members of the public. 44 U.S.C. § 2204(c)(1).

unwarranted invasion of personal privacy. These exemptions are imposed by the Archivist, following a thirty-day review by both the former and current Presidents.

After twelve years, the PRA exemptions no longer apply. Only the FOIA exemptions apply at that point, except one: there is no longer an automatic statutory exemption to withhold communications between the President and his advisors and among the advisors themselves or any other deliberative records. However, even after twelve years, both the former and current Presidents still review Presidential records prior to release to consider whether to assert the privilege that covers communications between the President and his advisors and among the advisors themselves, or any other deliberative records. Executive Order 12667, issued by President Reagan in January 1989, establishes the procedures for notifying the former and incumbent Presidents and for asserting that privilege against the release of Presidential records. Pl. Mot. for Summ. J. ("Pl.Mot.") Attach. 5. *See also* John W. Carlin, *Opening the Reagan Records* (August 2001), *at* http://www.archives.gov/presidential_libraries/presidential_records/opening_reagan_records.htm (last visited March 23, 2004).

**2.** The other categories of information are: classified materials related to national defense or foreign policy, 44 U.S.C. § 2204(a)(1); materials "relating to appointments to federal

office," *id.* § 2204(a)(2); information "specifically exempted from disclosure by statute," *id.* § 2204(a)(3); privileged or confidential trade secrets and commercial or financial information, *id.* § 2204(a)(4); and information "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* § 2204(a)(6). Purely personal documents are excluded from the PRA's definition of "Presidential records," *id.* § 2201(2)(B)(ii).

**3.** Four of the exemptions from access are the same as categories to which a president may delay access for 12 years.

**4.** The exemptions are: national security information, 5 U.S.C. § 552(b)(1); information on internal personnel matters, *id.* § 552(b)(2); information statutorily exempted from disclosure, *id.* § 552(b)(3); privileged or confidential "trade secrets and commercial or financial information," *id.* § 552(b)(4); information "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," *id.* § 552(b)(6); certain types of "[r]ecords or information compiled for law enforcement purposes," *id.* § 552(b)(7); information used by "an agency responsible for the regulation or supervision of financial institutions," *id.* § 552(b)(8); and "geological and geophysical information and data, including maps, concerning wells," *id.* § 552(b)(9).

Third, the PRA states that "[n]othing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President." *Id.* § 2204(c)(2).

Under the PRA, the Archivist must notify the former president "when the disclosure of particular documents may adversely affect any rights and privileges which the former President may have." *Id.* § 2206(3). The National Archives and Records Administration ("NARA") has implemented this requirement by promulgating a regulation providing that whenever the Archivist intends to make public any presidential record, he must provide 30 days' notice to the former president to allow him, or his designated representative, to assert any rights or privileges that would foreclose access to the materials. 36 C.F.R. § 1270.46(a), (b), (d). If the former president raises such a right or privilege intending to preclude disclosure, "and the Archivist nevertheless determines that the record in question should be disclosed in whole or in part, the Archivist shall notify the former President or his representative," and "shall not disclose [the records] for at least 30 calendar days ..." *Id.* § 1270.46(c), (d). Copies of either notice to a former president of impending disclosure must be provided to the incumbent president as well. *Id.* § 1270.46(e).

## C. Executive Order 12,667 ("Reagan Order")

President Ronald Reagan signed Executive Order 12,667 ("Reagan Order") on January 18, 1989, "in order to establish policies and procedures governing the assertion of Executive privilege by incumbent and former Presidents in connection with the release of Presidential records" by NARA under the PRA. Reagan Order, 54 Fed.Reg. 3403; *see also* 44 C.F.R. § 2204 note. The Reagan Order specified three situations in which presidential records could be withheld: national security, law enforcement, and the executive deliberative process privilege, and gave the incumbent president the authority to assert privilege over the records of a former president. *Id.* §§ 1(g), 3.

When the Archivist notified an incumbent and former president of his intent to open records, the Reagan Order required him to "identify any specific materials, the disclosure of which he believes may raise a substantial question of Executive privilege." *Id.* § 2(a). After 30 days, the Archivist would be free to disclose the records, "unless during that time period the Archivist [received] a claim of Executive privilege by the incumbent or former President or the Archivist has been instructed by the incumbent President or his designee to extend the time period." *Id.* § 2(b). The Reagan Order provided that both the incumbent and former presidents could assert executive privilege, but that the Archivist would only be bound to accept the privilege claim of an incumbent president. *Id.* §§ 3–4. The Reagan Order required the Archivist to abide by an incumbent president or his designee's direction as to whether to accept or deny a former president's claim of privilege, unless ordered otherwise by a court. *Id.* § 4.

The Reagan Order was revoked by Executive Order 13,233, discussed infra.

## D. Executive Order 13,233 ("Bush Order")

### 1. Factual Backdrop for the Bush Order

The records generated during President Reagan's terms in office were the first to be subject to the provisions of the PRA. Before leaving office, President Reagan exercised his right under the PRA to restrict appropriate materials for the maxi-

mum 12 year period, including "confidential communications" with his advisors. Compl. ¶ 28. President George W. Bush took office in January 2001, the same time that President Reagan's 12 year restrictions on certain records expired, and in February 2001, NARA notified President Bush and former President Reagan that it intended to release these materials because the period of their restriction had expired. Compl. ¶¶ 27, 33. The notice did not state that any records "raise a substantial question of Executive privilege" within the meaning of § 2(a) of the Reagan Order.

In response to NARA's notice, White House Counsel Alberto R. Gonzales twice instructed the Archivist to extend the time available for President Bush to review the soon-to-be-released presidential records, for a total extension of 180 days. Compl. ¶ 36; Pl. Stmt. of Undisputed Facts ("Pl. Stmt.") Ex. 2, 3. At the end of the 180 days, White House Counsel Gonzales instructed the Archivist to extend the time for White House review for "a few additional weeks," stating that the extended review period "has been necessary for this Administration to review the many constitutional and legal questions raised by potential release of sensitive and confidential Presidential records, and to decide upon the proper legal framework and process to employ in reviewing such records on an ongoing basis." Pl. Stmt. Ex. 4; Def. Resp. to Pl. Stmt. ¶ 1.

On November 1, 2001, President Bush issued Executive Order 13,233, entitled "Further Implementation of the Presidential Records Act." Bush Order, 66 Fed. Reg. 56025; see also 44 U.S.C. § 2204 (Supp.2003). The stated purpose of the Bush Order is "to establish policies and procedures implementing [the Presidential Records Act] with respect to constitutionally based privileges ..." Id. preamble.

The Order "is not intended to indicate whether and under what circumstances a former President should assert or waive any privilege. The order is intended to establish procedures for former and incumbent Presidents to make privilege determinations." Id. § 9.

### 2. The Bush Order's Stated Constitutional and Legal Background

Section 2 of the Bush Order details the order's constitutional and legal background. Id. § 2. After the 12–year period during which a former president's records can be shielded from public view, the PRA directs the Archivist to follow the FOIA guidelines when releasing presidential records. Id. § 2(a). While the PRA explicitly states that FOIA exemption (b)(5) is not a permissible basis on which the Archivist may withhold documents from the public after the 12–year period has elapsed, see 44 U.S.C. § 2204(c)(1), the Bush Order states that 44 U.S.C. § 2204(c)(2) "recognizes that the former President or the incumbent President may assert any constitutionally based privileges, including those ordinarily encompassed within [FOIA exemption (b)(5)]." Bush Order § 2(a).

The Bush Order includes a detailed description of what purportedly constitutes a president's constitutionally-based privilege. The Bush Order removed the privilege for law enforcement records, and added several categories instead:

The President's constitutionally based privileges subsume privileges for records that reflect: military, diplomatic, or national security secrets (the state secrets privilege); communications of the President or his advisors (the presidential communications privilege); legal advice or legal work (the attorney-client or attorney work product privileges); and the deliberative processes of the Presi-

dent or his advisors (the deliberative process privilege).

*Id.* In addition, the Order states that the executive exercise of a constitutionally-based privilege does not expire simply due to the passage of time, relying on *Nixon v. Administrator,* which held that "constitutionally based privileges available to a President 'survive[ ] the individual President's tenure.'" *Id.* § 2(b) (quoting *Nixon v. Administrator,* 433 U.S. at 449, 97 S.Ct. 2777).

The Order also maintains that "a former President, although no longer a Government official, may assert constitutionally based privileges with respect to [his records], and [the Supreme Court] expressly rejected the argument that 'only an incumbent President can assert the privilege of the Presidency.'" *Id.* (quoting *Nixon v. Administrator,* 433 U.S. at 448, 97 S.Ct. 2777). Finally, the Bush Order sets out a standard which those requesting presidential documents must meet. As opposed to the FOIA standard, which requires no showing of need for the information sought, the Bush Order requires a "'demonstrated, specific need' for particular records, a standard that turns on the nature of the proceedings and the importance of the information to that proceeding." *Id.* § 2(c), quoting *United States v. Nixon,* 418 U.S. 683, 713, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

### 3. Procedures Under the Bush Order

The Bush Order sets out several procedures for the Archivist when administering presidential records. When the Archivist receives a request for unreleased presidential records, the Bush Order requires the Archivist to notify both the former president and incumbent president, and provides them with the records sought. Bush Order § 3(a). The Archivist may not release the records while the former president reviews them. *Id.* § 3(b). The incumbent president or his designee has the concurrent ability to determine whether to invoke executive privilege with respect to the records. *Id.* § 3(d). If the former president requests that the records be withheld as privileged, and the incumbent president concurs in the former president's decision, the incumbent president informs the former president and the Archivist of his agreement. *Id.* § 3(d)(1)(I).

The Bush Order also permits former presidents to raise the executive privilege, even in the face of disagreement from the incumbent president, and permits the incumbent to raise the privilege with respect to a former president's papers, even if the former president does not raise the privilege himself. *Id.* §§ 3(d)(1)(ii), 3(d)(2)(ii). The Bush Order indicates that the incumbent president will concur in the former president's privilege decision "[a]bsent compelling circumstances." *Id.* § 4. The Archivist may not disclose the records until the incumbent president informs the Archivist that both he and the former president agree to permit access, "or until ordered to do so by a final and nonappealable court order." *Id.* § 3(d)(1)(I); *see also id.* §§ 3(d)(1)(ii), 3(d)(2)(I), 3(d)(2)(ii).

Finally, the Bush Order maintains that the records of a former vice president are to be administered with the same procedures as those of a former president, and that both the PRA and the Bush Order apply to vice presidential records in the same manner as they would apply to presidential records. *Id.* § 11.

### E. Records in Dispute

When Plaintiffs originally brought this suit, the question of which records, if any, were being withheld was a subject of some dispute. The Court's unusually heavy docket during the pendency of this litigation accounts for the delay in resolving the

issues presented, and in the intervening time, the Reagan presidential records have gradually been released to the public. Originally, some 68,000 pages of former President Reagan's records appeared to be under review by former President Reagan and President Bush. *See* Compl. ¶¶ 53–57 Over the course of this litigation, various records have been released while new records have come to light. While former President Reagan had initially indicated he would assert privilege over certain documents and a segment of videotape, Defendants have informed the Court that former President Reagan has asserted privilege only over 11 documents, totaling 74 pages of presidential records, and that President Bush has "determined to assert constitutionally based privilege in concurrence with former President Reagan[ ]." Def. Further Notice with Respect to Processing of Records (Def. Further Notice) at 1.

While these 74 pages were not encompassed in the approximately 68,000 pages of records specifically disputed in Plaintiffs' complaint, *see* Def. Notice with Respect to Processing of Records (Def.Notice) at 2, Plaintiffs' complaint was framed to generally address any records of the Reagan presidency that were being withheld pending a privilege review, whether or not Plaintiffs were aware of them at the time of filing. Compl. ¶ 1 ("[Plaintiffs bring this action] to compel the release of presidential materials of former President Ronald Reagan that are in the custody of NARA and are being withheld in violation of the PRA."); *see also* Pl. Opp. to Def. Mot. to Dismiss ("Pl.Opp.") at 6 n. 2 ("[T]hese 68,000 pages are not the *only* Reagan records [in dispute] .... Since only a little more than 10% of the Reagan records have so far been processed for opening to the public, there are very likely [many] more pages of documents ... that will now be subject to the Bush Order ...."). Plaintiffs have not indicated to the Court that any other Reagan presidential records remain unavailable to the public.

## III. Issues Presented to the Court

Although Plaintiffs raise a number of issues in their complaint,[5] they seek summary judgment on a narrower question:

[P]laintiffs seek summary judgment declaring that the Bush order is unlawful

---

5. Plaintiffs' complaint challenges the Bush Order, seeking declaratory relief that the Order is unlawful because it violates the PRA in several ways, and injunctive relief enjoining the implementation of the Bush Order and compelling the release of documents withheld by virtue of the Order's provisions.

First, Plaintiffs allege that the Bush Order makes it possible for materials to be withheld for an unlimited time because it allows incumbent and former presidents to review materials before their release. They argue that this violates "the PRA's command that records may not be restricted after the 12–year period expires, and that the Archivist has an affirmative duty to make them public as soon as possible." Compl. ¶ 60(i); *see also* Bush Order § 3(a)-(d).

Second, Plaintiffs allege that the Bush Order violates the PRA by requiring the incumbent president to concur with a former president's assertion of privilege, absent compelling circumstances, even if there is no legal basis for the exercise of privilege. Compl. ¶ 60(ii); *see also* Bush Order § 4.

Third, Plaintiffs claim that the Bush Order impermissibly requires the Archivist to wait until the former president permits the release of records, even if the incumbent president has authorized their release. Compl. ¶ 60(iii); *see also* Bush Order § 3(d). Plaintiffs argue that this means the only way to achieve the release of the former president's records is through a binding court order or by the former president's acquiescence, and leaves the Archivist powerless to act without direction from the incumbent president. Compl. ¶ 60(iii).

Fourth, the complaint alleges that the Bush Order violates the PRA by allowing a former president who is deceased or disabled to designate a representative to make determinations about whether to assert executive privilege over records or to allow public access to them. Compl. ¶ 60(iv); *see also* Bush Order

and may not be implemented by the Archivist and NARA to the extent it purports to give former Presidents, Vice Presidents, and their representatives unilateral authority to direct the Archivist to withhold presidential and vice presidential records from the public. Plaintiffs further seek a permanent injunction ordering the Archivist and NARA not to implement the Bush order, and to make Reagan and Bush presidential and vice presidential records available to the public promptly and without regard to the Bush Order.

Pl. Mot. for Summ. J. ("Pl.Mot.") at 2–3.[6]

Defendants filed their motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), stating that dismissal is appropriate because Plaintiffs'

claims are not justiciable, and even assuming their justiciability, that Plaintiffs have failed to state a claim upon which relief may be granted. Def. Mot. to Dismiss ("Def.Mot.") at 14. Defendants raise justiciability challenges to Plaintiff's suit on mootness, standing, and ripeness grounds. *See* Def. Mot. to Dismiss ("Def.Mot.") at 14–25.

The Court must first consider whether Plaintiffs' claims are justiciable. Because the Court finds that Plaintiffs' claims are not justiciable, the Court will not address the merits of the parties' dispositive motions.

## IV. Legal Standard

▆▆▆ In reviewing motions to dismiss for lack of jurisdiction pursuant to Federal

---

§ 10. The Bush Order also allows the family of a deceased or disabled former president to appoint a representative for these purposes. *Id.* Plaintiffs object on the grounds that an individual who has never held the office of president is not entitled under the Constitution to assert executive privilege. Compl. ¶ 60(iv).

Fifth, Plaintiffs dispute that a former vice president is entitled to assert a claim of executive privilege independent from a former or incumbent president, or that such a claim by a former vice president is entitled to the same treatment as a privilege claim by a president. Compl. ¶ 60(v); *see also* Bush Order § 11. Plaintiffs claim that there is "no constitutional basis for a vice presidential executive privilege." Compl. ¶ 60(v).

Plaintiffs also allege that the Bush Order is contrary to NARA's regulations, which allow the Archivist to open records even when a former president has asserted privilege, if he determines that such privilege claim is improper. 36 C.F.R. § 1270.46(c). The Archivist must provide notice to the former president of the denial of the claim of privilege. *Id.* § 1270.46(d). Plaintiffs argue that these regulations, lawfully promulgated under notice and comment procedures of the Administrative Procedures Act, 5 U.S.C. § 553, "pursuant to authority delegated by NARA by the PRA ..., take precedence over the Bush Or-

der, which is based on no statutory authority and was issued without adherence to the APA rulemaking process." Compl. ¶ 61.

Plaintiffs also allege that the Bush Order impermissibly expands the constitutional scope of executive privilege, Compl. ¶ 62, Bush Order § 2, and that the Archivist's implementation of the Bush Order constitutes arbitrary and capricious agency action under the APA, 5 U.S.C. § 706(2)(A) & (C). Compl. ¶ 64.

6. Defendants state that the summary judgment motion "clears away much of the underbrush" of Plaintiffs' complaint. Def. Opp. to Pl. Mot. for Summ. J ("Def.Opp.") at 1. In response to Defendants' allegation that Plaintiffs have narrowed their request for relief by declining to challenge certain portions of the Bush Order, Plaintiffs attempt to "clear up certain misconceptions ... about the nature of the relief [P]laintiffs seek" in their reply. Pl. Reply at 4. Plaintiffs state that the government misunderstood their motion, which should properly be read to indicate that "we are not now seeking *summary judgment* based on the unlawfulness of those specific features of the Order. Since the theories advanced in the summary judgment motion support all the *relief* plaintiffs seek, plaintiffs need not argue all of the theories advanced in the Complaint to obtain summary judgment." *Id.*

Rule of Civil Procedure 12(b)(1), "the allegations of the complaint should be construed favorably to the pleader." *Walker v. Jones*, 733 F.2d 923, 925–26 (D.C.Cir. 1984) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). "While the complaint is to be construed liberally, the Court need not accept factual inferences drawn by plaintiff if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Primax Recoveries, Inc. v. Lee*, 260 F.Supp.2d 43, 47 (D.D.C.2003) (citing *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1430 (D.C.Cir.1996)); *see also American Farm Bureau v. E.P.A.*, 121 F.Supp.2d 84, 90 (D.D.C.2000) (same). In the 12(b)(1) context, the plaintiff bears the burden of proving jurisdiction. *Vanover v. Hantman*, 77 F.Supp.2d 91, 98 (D.D.C.1999), *aff'd* 38 Fed.Appx. 4, 2002 WL 1359630 (D.C.Cir. 2002). In its consideration of a motion under 12(b)(1), a district court may look beyond the pleadings to inquire into facts pertinent to its jurisdiction. *See Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947).

## V. Discussion of Justiciability

Before the Court can begin to address the substantive matters raised in this case, it must make a determination as to the justiciability of Plaintiffs' claims. Indeed, the parties have devoted much of their briefing to this threshold question, while at the same time the materials Plaintiffs seek have been gradually released. Swaths of the parties' justiciability arguments have been rendered obsolete by the former and

incumbent presidents' decision to assert executive privilege over 74 pages of records. *See* Def. Mot. at 16, 19–20, 21–22 (statements made before the decision to assert executive privilege over 74 pages, in which Defendants argue that Plaintiffs' claims are not properly reviewable because they depend on the future assertion of executive privilege).[7]

The Court is only empowered to consider cases and controversies, and "[i]n an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing, ripeness, mootness, and the political question doctrine." *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C.Cir.1996) (quoting *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The first three, standing, ripeness, and mootness, are implicated in this case. Defendants raise each of them in their motion to dismiss. *See* Def. Mot. to Dismiss ("Def.Mot.") at 14–24. The Court will address standing and ripeness in turn. The Court will not address mootness because it finds that Plaintiffs' claims are not justiciable under the standing and ripeness analyses.

### A. Standing

■ Defendants argue that Plaintiffs do not have standing to challenge the Bush Order. Def. Mot. at 15–21. To establish standing, Plaintiffs must demonstrate that they have suffered an injury in fact that is concrete and particularized, and actual or imminent, not conjectural or hypothetical.

7. The Court notes that Plaintiffs did not request leave to file any additional briefing on the issue of justiciability after Defendants notified the Court that all documents had been released, with the exception of 74 pages over which privilege had been asserted. The Court takes this to mean that Plaintiffs do not challenge the assertion of privilege over the 74 pages, and that neither party wants to add anything to their earlier justiciability arguments.

*See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations omitted). Plaintiffs must also show that the injury is fairly traceable to the challenged conduct, in the form of a causal connection between the injury and the conduct. *Id.* Finally, Plaintiffs must show that the injury is likely to be redressable by the relief sought. *Id.* at 561, 112 S.Ct. 2130. The Court finds that Plaintiff's cannot show redressable injury in fact, and as such will not consider the causation prong of the standing analysis.

### 1. Injury in Fact

Defendants assume for the purposes of their motion to dismiss that Plaintiffs were injured by the delay involved in the privilege review undertaken pursuant to § 3(c) of the Bush Order, after the 12–year restriction on the Reagan presidential records expired. Def. Mot. at 15.[8] Plaintiffs argue that they have been injured, not merely by delay, but also by what they consider unlawful denials of access after the expiration of the 12–year period, and imminent (at the time of their filing) denials that "will occur as the terms of the Bush order giving former Presidents, Vice Presidents and their 'representatives' veto power over public access are applied." Pl. Opp. at 6.

By "continuing unlawful *denial* of access that has already occurred," Plaintiffs refer to NARA's unwillingness to provide access to records as soon as they were authorized for release, *see* Pl. Opp. Attach. 1 (Decl. of Bruce Craig) ¶ 3, as well as NARA's unwillingness to release documents while they were the subject of a privilege review.

*See* Pl. Mot. Attach. 6–10 (letters between Prof. Hugh Davis Graham, Public Citizen Litigation Group, the Ronald Reagan Library, and NARA, and a letter from the Ronald Reagan Library to Mr. Blanton of the National Security Archive) (emphasis in original).

The Supreme Court stated in *FEC v. Akins,* 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), that an "inability to obtain information ... that, on respondents' view of the law, the statute requires [be] made public" constitutes injury in fact for standing purposes. *Id.* at 21, 118 S.Ct. 1777. In *Akins,* the plaintiffs challenged an organization's refusal to release donors' names, as the plaintiffs argued was required by the Federal Election Campaign Act. In the instant case, Plaintiffs have ultimately been granted access to all the Reagan presidential records, with the exception of 74 pages over which executive privilege has lawfully been asserted. Accordingly, Plaintiffs' inability to access materials amounts to something less than a denial of access.

There is no dispute, though, that when Plaintiffs requested the Reagan presidential records at the expiration of the 12–year restriction permitted by the PRA, they were unable to obtain the materials to which Plaintiffs believe the PRA entitled them at the time. Defendants assume for purposes of their motion that this delay constitutes an injury in fact. The case law in this Circuit supports this assumption. *See Byrd v. EPA,* 174 F.3d 239, 243 (D.C.Cir.1999) (finding that denial of "timely access" constitutes "informational injury," thereby precluding any

---

**8.** Defendants note, however, that although they assume injury for purposes of their motion, they do not concede the point because "[t]he PRA does not purport to establish 'deadlines' for constitutional-privilege review." Def. Mot. at 15 n. 11. Defendants indicate that they do not believe such a delay, "absent an ultimate withholding," amounts to injury. *Id.* The Court notes that with the assertion of constitutional privilege over 74 pages, there has been both delay and an "ultimate withholding."

"serious challenge" to the injury element of the standing analysis); *see also Payne Enters. v. United States*, 837 F.2d 486, 491 (D.C.Cir.1988) ("Courts have long recognized that there 'may very well be circumstances in which prolonged delay in making information available … require[s] judicial intervention.' ") (quoting *Lybarger v. Cardwell*, 577 F.2d 764, 767 (1st Cir.1978)). It is clear, then, that Plaintiffs' past delays in access to presidential records satisfy the injury in fact requirement of the standing analysis.

■ Plaintiffs also allege future injury. Pl. Opp. at 6. Plaintiffs are engaged on an ongoing basis in the study of presidential records and the internal workings of the government, and will seek access to future collections of presidential records. The Court understands that Plaintiffs have a professional interest in presidential records and will most likely continue to seek such records in the future. Plaintiffs face substantially similar delays in the future should the terms of the Bush Order continue to be applied. The American Historical Association's members and the Organization of American Historians' members "regularly request and make use of presidential and vice presidential records held by NARA." Compl. ¶¶ 3, 7. Professor Stanley Kutler "makes extensive use of the records of former presidents and vice presidents at presidential libraries and other NARA facilities." *Id.* ¶ 5.

There is therefore a significant likelihood that Plaintiffs will again seek access to presidential records, and face indeterminate delays in accessing them. However, the Court cannot find that this future injury is sufficiently imminent, and not conjectural and hypothetical. At this stage Plaintiffs have no outstanding requests for presidential records, because there are no presidential records currently subject to the Bush Order, other than the 74 pages over which privilege has been asserted. Twelve years will soon have passed since the end of former President George H.W. Bush's presidency, at which point it is possible that these records will be subject again to the terms of the Bush Order. This Court, however, is not prescient, and cannot know at this point in what way the facts will reveal themselves when Plaintiffs themselves, or indeed other interested parties, seek the records of a different president. Both the former and incumbent presidents may make different decisions about any records whose period of restriction under the PRA has ended. Although it would be a coveted talent, the Court cannot predict who the incumbent president will be in 2005, or what effect, if any the election of 2004 will have on any future application of the Bush Order's provisions.

The Court comes to the inevitable conclusion that, while Plaintiffs have demonstrated past injury in fact, but that they cannot, at this stage, properly demonstrate future injury in fact that is imminent and not conjectural and hypothetical.

### 2. Redressability

■ Even though Plaintiffs have demonstrated sufficient injury, they lack standing under the redressability prong of the standing analysis. Redressability is satisfied if it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (internal quotations omitted). At this stage of the litigation, Plaintiffs request declaratory relief finding the Bush Order unlawful, and injunctive relief proscribing the Order's implementation. The Court finds that Plaintiffs' injury in fact is not redressable by the relief Plaintiffs seek.

It is quite obviously impossible to undo the delays that Plaintiffs experienced in gaining access to the Reagan presidential

records, and as explained in Section V(A)(1), *supra*, any future injury Plaintiffs might suffer as a result of the Bush Order is speculative at this point. Even if the Court were to find in Plaintiffs' favor on the merits of their claim and enjoin the application of the Bush Order, Plaintiffs' past delays would not be redressed. Plaintiffs' inability to access materials while former President Reagan's records were subject to privilege review cannot be redressed by a finding that the Bush Order's provisions may not be applied in the future.

Accordingly, the Court finds that Plaintiffs do not have standing to bring this suit. Although a finding of a lack of standing alone renders this case nonjusticiable, the Court will address ripeness as an alternative bases for nonjusticiability.

## B. Ripeness

Defendants challenge the justiciability of Plaintiffs' suit by alleging that the suit is not ripe for review on either constitutional or prudential grounds. *See* Def. Mot. at 21–24. Ripeness doctrine counsels that courts refrain from deciding cases where injury is speculative, and may never occur, because such cases are premature for review. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (explaining that the rationale underlying ripeness "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."). The Court has already explained that only a future injury would be redressable by the relief Plaintiffs seek. It is clear that any future injury is at this point purely speculative, and consequently the Court cannot find that Plaintiffs have a ripe controversy.

Ripeness, like standing, requires the constitutional minimum of impending injury in fact, which Plaintiffs have not established. *See* Section V(A)(1), *supra*. Although Plaintiffs have not shown constitutional ripeness, the Court will consider the question of prudential ripeness in the interest of thoroughness. Prudential ripeness requires the Court to balance "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507.

Defendants contend that Plaintiffs' claims are "academic," and that "any 'hardship' Plaintiffs might suffer is outweighed by the institutional interests in postponing review," Def. Mot. at 23. In considering the hardship prong of prudential ripeness, the Court finds that it must agree with Defendants. The Court is mindful of the fact that this suit has been lengthy and labor-intensive for the parties, who have fully briefed each of their dispositive motions and filed ongoing updates with the Court as to the release of some presidential records and the assertion of executive privilege over others. However, the Court cannot ignore the requirements of Article III of the Constitution, which require a live controversy at each stage of litigation. Accordingly, any hardship to the parties of postponing review does not overcome the fact that review of Plaintiffs' claims is inappropriate at this time.

The second prong of prudential ripeness, the fitness of these issues for judicial consideration, is similarly not satisfied. At this point in the litigation, the Court is presented with an abstract disagreement in need of factual development. The Archivist and NARA will continue to apply the Bush Order to presidential records, but the only redressable injury Plain-

tiffs might have is speculative. Defendants cite *Abbott Laboratories* for the proposition that "prudential ripeness protects other Branches from judicial interference until the effects of their decisions are 'felt in a concrete way by the challenging parties.'" Def. Mot. at 23, quoting *Abbott Labs.*, 387 U.S. at 148–148, 87 S.Ct. 1507. Although the Bush Order may have had a concrete impact on Plaintiffs, it is not clear that it will inevitably impact them in the same way in the future.

Although it may be likely that Plaintiffs will again encounter delays in access to presidential records if the terms of the Bush Order are applied in the future, such injury is at this point hypothetical. Accordingly, the Court is compelled to find that Plaintiffs claims are not ripe for review.

## VI. Conclusion

The Court is bound by the justiciability doctrines to only consider the merits of a live controversy. Plaintiffs' past injury is simply not redressable by the relief they seek, and their only possible redressable injury is at this stage simply too hypothetical. It necessarily follows that Plaintiffs claim is not ripe for review, and cannot be ripe until Plaintiffs have some actual or imminent redressable injury. In keeping with the Article III prohibition on advisory opinions, the Court must find this suit nonjusticiable, and consequently the Court has no jurisdiction over this case at this time.

An appropriate Order accompanies this Memorandum Opinion.